FILED
2018 Jul-18  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit "A"

ELECTRONICALLY FILED
7/10/2018 10:39 AM
01-CV-2018-902707.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

# IN THE CIRCUIT COURT FOR JEFFERSON COUNTY, ALABAMA
## BIRMINGHAM DIVISION

| | | |
|---|---|---|
| **MOUNT ROYAL TOWERS,** | ] | |
| | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION** |
| | ] | **CASE NO. _____** |
| | ] | |
| **STERICYCLE, INC. and** | ] | **JURY TRIAL DEMANDED** |
| **FICTITIOUS DEFENDANTS ONE** | ] | |
| **THROUGH TWENTY, whose names** | ] | |
| **and identities are otherwise** | ] | |
| **unknown to the Plaintiff but whose** | ] | |
| **true names will be substituted by** | ] | |
| **amendment when they are** | ] | |
| **ascertained, and who are further** | ] | |
| **described in paragraph _ of this** | ] | |
| **complaint,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## COMPLAINT

Mount Royal Towers ("Mount Royal" or "Plaintiff") states the following as its complaint against Defendant Stericycle, Inc. ("Stericycle" or "Defendant"):

## INTRODUCTION

1.    The Complaint is brought for violation of Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq*., and its Uniform Deceptive Trade Practices Act (the "IDTPA"), codified at 815 ILCS § 510/1 *et seq.,* fraud, breach of contract, unjust enrichment, and money had and received.

2.    The Illinois Consumer Fraud and Deceptive Business Practices Act forbids "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any

material fact" in the conduct of any trade or commerce. 815 ILCS § 505/2. The IDTPA similarly makes unlawful deceptive acts or practices in the conduct of any trade or commerce, including "[e]ngaging in any other conduct which … creates a likelihood of confusion or misunderstanding." 815 ILCS § 510/2(a)(12).[1]

3.     Stericycle's acts and practices in dealing with Mount Royal were intentionally structured to create confusion and misunderstanding on Mount Royal's part. Among other practices, Stericycle enters into long-term "fixed rate" contracts with its customers which it claims will control costs and can be adjusted only for a very limited number of reasons such as regulatory changes imposing additional costs. Notwithstanding such representations, Stericycle arbitrarily charges its customers ever-escalating amounts through automated price increases that are without any justification of any kind. When customers discover these issues and protest and/or cancel their service, they are punished with liquidated damages provisions in their contracts and a series of contractual terms that are unreasonably favorable to Stericycle and are oppressive, one-sided, unconscionable, and patently unfair. The liquidated damages terms are only possible because of the unequal bargaining power among the parties and the lack of meaningful choice in the regulated medical waste industry.

---

1 *See Unique Concepts, Inc. v. Manuel*, 669 F. Supp. 185, 191 (N.D. Ill. 1987) ("Any conduct in a business which creates a likelihood of consumer confusion or misunderstanding is potentially actionable.").

## PARTIES

4.      Mount Royal Towers is an Alabama non-profit corporation with its principal place of business in Jefferson County, Alabama. Mount Royal is a full-service retirement community and health center. Mount Royal provides several levels of care for senior citizens, including independent and assisted living communities and skilled nursing care. Mount Royal has to dispose of medical waste collected in the course of the operation of its facility.

5.      Stericycle, Inc. is a Delaware corporation with a principal place of business located at 28161 North Keith Drive, Lake Forest, Illinois. Its registered agent in Alabama is CT Corporation System, 2 North Jackson St., Suite 605, Montgomery, AL 36104.

6.      Fictitious Defendants are described as follows:  Defendants 1-20, being the correct legal description of those entities described in the style of this cause and/or the correct legal description of that or those entities doing business with Mount Royal as "Stericycle."

7.      Stericycle describes itself as a "global business-to-business solutions provider." Its customers' industries are "healthcare, pharmacies & retail, biotech, manufacturing, professional services, governments." Its "[c]ontracts generally include pass through price increase provisions" and it focuses on small customers because "[s]mall account customers generate gross margins higher than large account customers" and "[s]mall account customers are more likely to outsource and are easier to up-sell."

8.     For years, Stericycle generated its nearly $3 billion in annual revenues by programming its internal billing and accounting software to automatically charge an 18% annual price increase in the flat rates charged to its customers. In 2015, Stericycle had $2.99 billion in revenue and GAAP gross profit of $1.27 billion. At all times material to this complaint, Stericycle operated a medical waste removal service in Alabama for the Plaintiff and others.

## JURISDICTION AND VENUE

9.     Pursuant to ALA. CODE §§ 6-3-7 and 12-12-30, this judicial district is the proper jurisdiction and venue for this action because a substantial part of the events or omissions giving rise to the claim occurred in Jefferson County and the matter in controversy exceeds $10,000, exclusive of interest and costs. Plaintiff is physically located in this county and entered into contracts with Stericycle from this county. This Court has personal jurisdiction over the Defendant because Defendant has sufficient minimum contacts with Alabama. Defendant avails itself of the privilege of conducting business in Alabama through medical waste removal and transportation services sufficient to render the exercise of personal jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

## FACTS

### A.     Stericycle

10.     Stericycle has been in the medical waste business since 1989. As Stericycle explains on its website,[2] medical waste includes "any solid waste that is generated in the diagnosis, treatment, or immunization of human beings or

---

[2]See http://www.stericycle.com/compliance/tools-and-resources/faqs/medical-waste/

animals." It includes but is not limited to items that are freely dripping liquid or semi-liquid blood or "potentially infectious materials" or could readily release infectious materials if compressed, items containing dried blood or "potentially infectious materials" that could release flakes if compressed or otherwise handled, human blood and blood products, hemodialysis waste of all items that were in contact with a patient's blood (tubing, filters, towels, gloves, aprons, lab coats) and any other contaminated disposable equipment, human or animal isolation wastes, sharps waste, surgery or autopsy tissue, organs, or body parts, surgical and autopsy wastes, cultures or stocks of any virus, bacterium or other organism including discarded live attenuated vaccines and the items used to transfer, inoculate or mix cultures, tissues, organs, body parts, bedding, carcasses, and body fluids from experimental animals, teeth in dentistry, laboratory wastes that have been in contact with infectious wastes, discarded medical equipment and its components that have been in contact with infectious agents, any other discarded item or waste that an administrator believes poses a threat to human health or the environment, potentially infectious body fluids. Stericycle's waste-related services include waste pickup and disposal.

11.   Stericycle serves more than 1,000,000 customers worldwide (as of 2016). It divides its customers into two categories: large-quantity and small-quantity waste generators. Large-quantity waste generators include hospitals, blood banks, and pharmaceutical manufacturers. Small-quantity waste generators include medical practices, outpatient medical clinics, medical and dental offices,

long-term and subacute care facilities, veterinary offices, retail pharmacies, and other similar entities. The vast majority of Stericycle's customers are small-quantity or "SQ" customers.

12.    When Stericycle engages with a new small-quantity customer, it offers the customer a standard form Steri-Safe Contract. It provides for monthly or quarterly waste pick-ups. Mount Royal signed the Steri-Safe Contract.

13.    The term of the Steri-Safe Contract is typically 36 to 60 months from the effective date. To prevent automatic renewal, the customer must give 60 days' written notice of intent to terminate the agreement, and the notice must be made during the six-month period prior to the renewal date.

14.    If a customer terminates the Steri-Safe Contract prior to expiration of the term, Stericycle contends it has the right to recover from the customer liquidated damages in an amount equal to 50% of the customer's average monthly charge multiplied by the number of months remaining on the term.

15.    The Steri-Safe Contract is governed by Illinois law.

16.    Upon information and belief, the Steri-Safe Contract originated from Stericycle's offices in Illinois.

17.    At all times relevant to this action, Stericycle issued invoices to Mount Royal from its Illinois offices. Stericycle further directed that payment of these invoices be sent to its offices in Illinois.

18.     Any customer, including Mount Royal, wishing to terminate its contract with Stericycle must communicate with Stericycle personnel in Bannockburn, Ilinois.

19.     Customers typically pay Stericycle a flat fee on a monthly or quarterly basis. The flat fee is listed on the cover page of the Steri-Safe Contract.

20.     Stericycle may increase the monthly or quarterly flat fee only under limited conditions during the term of the contract:

> Stericycle reserves the right to adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation.

21.     Despite these limitations under which Stericycle may increase its fees, Stericycle has engaged in a systematic and deliberate practice of raising its fees based on annual automated price increases ("API") of 18% on Steri-Safe Contract customers. These predetermined price increases were unconscionable, deceptive, fraudulent, improper, and just plain wrong because they bear no relationship to Stericycle's "operational changes," "documented changes in the law," or "cost escalation."

22.     Upon information and belief, Stericycle implemented its API scheme from its headquarters in Illinois.

23.     Stericycle's Vice President of Sales Operations explained automated price increases as follows:

> Q. …what's your understanding of the term "automated price increase"?

A. Automated price increase is a system-generated price increase that's applied to the customer's pricing.

Q. And for small quantity customers who have not -- whose contract does not specifically state what their future pricing is going to be, unless that customer is for some reason exempted from the automated price increase process, those price increases are imposed on the customer by a function of Stericycle's billing system; is that right?

A. Yes.

Deposition of James Edward Buckman, pp. 30-31. He continued:

Q. During your time at Stericycle it's been true, hasn't it, that the standard automated price increase percentage for small quantity customers was 18 percent?

A. Yes.

*Id.* at 32.

24.     Stericycle uses (or has used) an electronic financial accounting and reporting system named "Tower." The automated price increase process is built into the Tower system, but the intervals at which Stericycle has imposed API has varied. Stericycle modulated the timing of the API in order to meet revenue targets – there was no connection to actual cost increases that might justify a price increase. Automated Price Increases are a major revenue source for Stericycle.

25.     Stericycle's costs fluctuate and do not uniformly increase from year-to-year, but Stericycle does not modify the API to reflect these fluctuations. Stericycle does not internally correlate the API to its own costs. Stericycle's costs do not increase 18% every nine or twelve months.

26.     In a deposition, Mr. James Edward Buckman (Stericycle's Vice President of Sales Operations) conceded that automated price increases are

implemented to make sure that Stericycle achieves the revenue numbers it has predicted. The increases bear no relation to actual costs. In the words of Mr. Buckman:

> Q. And what about, have you ever heard mention of needing to increase revenue in order to meet the revenue forecasts that Stericycle gives to the investment community?

> A. I would say that's part of our internal goal. That's related to our internal goal.

> Q. ….you're concerned more with meeting revenue targets rather than being concerned about the cost of providing services or products to Stericycle's customers; isn't that right?

> A. That is the primary focus of the sales and marketing organization.

> Q. So, you are given a revenue goal and you figure out how to meet that goal, but in making decisions in order how to do that, you don't specifically consider Stericycle's cost of, you know, how much it cost to provide services to any specific customer or type of customer; isn't that right?

> A. I don't understand the question.

> Q. Well, I think you said it's another part of Stericycle's organization that keeps track of the cost of providing goods and services to customers, right?

> A. Correct.

> Q. You are given a revenue target or a revenue goal that you are expected to meet along with your colleagues, and you come up with initiatives in ways that you think that you can meet that goal, correct?

> A. Correct.

> Q. But when you are making decisions about specific initiatives, such as changing the frequency of automated price increases, you don't go back and look and say, hey, how much is – you know, how much is it costing us to dispose of medical waste, how much are we paying for labor or any other specific cost factors when you are making those revenue decisions, do you?

A. Not specifically.

Q. You -- because from your point of view, whatever decisions there are about maintaining gross margins, those are made in setting the goal of revenue that you are expected to generate, right?

A. Right.

Q. So, when you are deciding whether to change the frequency of automated price increases, you don't need to go back and look at those cost figures; all you need to do is make sure you hit your revenue numbers in order to make sure you keep your margins, right?

A. In my role, yes.

Deposition of James Edward Buckman, pp. 68-70.

27.    The price increases that Stericycle imposed on small-quantity customers such as the Plaintiff can be determined from the electronic records contained in Stericycle's financial reporting systems.

28.    Stericycle concealed the API algorithm. When Stericycle imposes API, it issues an invoice to the customer for the new inflated flat fee without explanation. This makes it difficult, if not impossible for customers to discover that their fee increases were unjustified.

29.    Since 2004, Stericycle has known that several governmental authorities consider API to be an improper practice. These authorities include New York City, the State of New Jersey, and the State of Washington. Based on their objections, Stericycle has formulated a written policy forbidding the use of API within those jurisdictions.

30.    Stericycle executives have been aware that the federal government objected to API. In September of 2006, Stericycle's Vice President, Patrick Cott, sent

an email to his subordinates directing them to stop charging API to federal government customers. Nevertheless, Stericycle continued to impose API on its small-quantity private sector customers.

31.     Stericycle's deceptive actions have also been the subject of a large *qui tam* suit which only recently completed. The suit was brought by relator Jennifer Perez, a government customer relations specialist with Stericycle between 2004 and 2008.[3] Ms. Perez discovered that Stericycle was routinely imposing 18% price increases annually and even more often on customers with long-term fixed rate contracts that prohibited price increases or allowed increases only to address certain costs in servicing Stericycle's customers. According to Ms. Perez, her supervisors routinely admitted to her they were aware that Stericycle's APIs were improper.

32.     On April 28, 2008, Perez filed a *qui tam* complaint against Stericycle. She alleged that Stericycle defrauded the United States, 14 states, and the District of Columbia by imposing API in violation of its contracts. Ms. Perez further alleged, "Stericycle fails to inform its customers that despite the contract price it has agreed to, Stericycle intends to and adds unallowable surcharges to each bill, in addition to an undisclosed 18% across the board increase every 9 months."

33.     On January 2, 2013, Stericycle settled the case initiated by Ms. Perez with the Attorney General of New York. In the Settlement Agreement, Stericycle

---

[3] *See*, *e.g.*, *United States v. Stericycle, Inc.*, No. 08 C 2390, 2016 WL 369192, at *2 (N.D. Ill. Feb. 1, 2016).

admitted that during the period January 1, 2003, through September 30, 2012, it had presented invoices containing API which was not authorized by the contracts.

34.     The $2.4 million Settlement Agreement between Stericycle and New York provides that Stericycle will reimburse the state for 100% of the charges resulting from API. In addition, Stericycle agreed to pay treble damages to New York as a result of the API. That settlement did not provide any relief for the Plaintiff, Mount Royal.

35.     On February 1, 2016, United States District Court Judge William T. Hart granted a motion by Ms. Perez for the consent of the court for voluntary stipulation of dismissal of the *qui tam* action.

36.     Stericycle has also agreed to settle a class action lawsuit involving more than 180,000 SQ customers.[4] Stericycle has agreed to pay nearly $300 million in damages to class members as a result of its fraudulent practices.

37.     Mount Royal opted out of the class because it did not want to be forced to continue in its business relationship with Stericycle, as the settlement would require, and because the potential compensation it would receive is in no way representative of the damage Mount Royal suffered as a result of Stericycle's deceptive business practices.

38.     Plaintiff's experiences with Stericycle mirror the wrongful practices described in the *qui tam* action and the Stericycle class action.

---

[4] *See* Doc. 382 in *In Re: Stericycle, Inc. Steri-Safe Contract Litigation*, Case No. 1:13-cv-05795, MDL No. 2455 (N.D. Ill. Mar. 8, 2018).

**B.** **Stericycle's unlawful business practices with Mount Royal**

39.     Mount Royal's relationship with Stericycle began in 2004. Stericycle induced Mount Royal to sign its original contract by representing to it that the contract would be a fixed rate contract. As of July 2004, Stericycle charged Mount Royal $507.75 per month for regulated medical waste removal.

40.     Stericycle knew it would not charge Mount Royal a "flat fee" for its services when it presented the Steri-Safe Contract to Mount Royal. But Stericycle used the "Flat Monthly Fee" language intending that Mount Royal would rely on its misrepresentations and enter into the Steri-Safe Contract.

41.     By July 2006, Stericycle had increased its monthly fee to $765.03. This rapid upward trend in fees, uncoupled from actual costs borne by Stericycle, would continue for more than ten years. In September 2008, Stericycle charged Mount Royal $1,055.71 for waste removal services. A year later, it was $1,232.24.

42.     Stericycle and Mount Royal executed a second Steri-Safe contract on November 5, 2009, in which Stericycle stated that it would charge Mount Royal $1868.00 per month. Stericycle continued to incrementally and unjustifiably increase its rates, however. By February 2011, Stericycle had increased its monthly charges to Mount Royal to $2,274.64—more than double the price of the same service from just two years before.

43.     In August 2011, Stericycle again increased Mount Royal's fees by more than 20%, to $2,746.10. In February 2012, for the third time in 12 months, Stericycle increased Mount Royal's fees to $3,287.14.

44.    By February 2013, services for which Mount Royal entered a contract to pay a "flat monthly fee" of $1,868.00 were being billed to it at $4,589.02 per month, an increase of nearly 250%.

45.    One year later, with no substantial change in its costs or services provided to Mount Royal, Stericycle had raised its monthly fee to $6,699.89. By February 2015, Stericycle was fraudulently charging Mount Royal $9,610.58 per month to remove its regulated medical waste.

46.    In February 2016, Stericycle charged $13,792.93 for its medical waste removal services that had cost just $1,868.00 in 2009.

47.    Eventually, Mount Royal was unable to continue to pay these exorbitant and unjustified rates. Mount Royal ceased using Stericycle's services when the monthly charge increased to $17,066.77 in mid-2016. All told, Stericycle increased its charges—for the same services—by more than 900% in just seven years.

48.    Throughout Mount Royal's dealings with the Defendant, Stericycle implemented improper and unlawful price increases and overcharges, including price increases resulting in an unjustified multiplying of Mount Royal's costs.

49.    None of Stericycle's price increases has been proper or justified under Stericycle's contract with Mount Royal.

50.    Upon information and belief, Stericycle representatives working in Illinois actively concealed the true reasons for its price increases from Mount Royal,

making it impossible for Mount Royal to discover Stericycle's API scheme until after Mount Royal terminated the Steri-Safe Contract.

## CAUSES OF ACTION

## COUNT I

### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*, and Ilinois Deceptive Trade Practices Act, 815 ILCS § 510/2

51.     Stericycle engaged in unfair or deceptive acts or practices by imposing automated price increases and charging undisclosed fees. Stericycle knew that its practice was not authorized by its contracts with Mount Royal, but it nevertheless used various forms of pressure and trickery to force Mount Royal to pay as much of the API as possible.

52.     Stericycle further engaged in unfair or deceptive acts or practices by knowingly or willfully concealing, suppressing, or omitting material facts from Mount Royal and by making affirmative misrepresentations in order to induce Mount Royal to enter into medical waste disposal contracts and/or remain a Stericycle customer. Stericycle's scheme included concealing that its agreements were not actually fixed-price agreements, and that it used an automated price increase algorithm in its computer system to automatically increase its charges to Mount Royal, lying to Mount Royal about the rates that it had been and would be charged by Defendant, issuing invoices to Mount Royal reflecting prices greater than those authorized by its contracts and without notice of the price increase, giving fabricated and misleading rationales for price increases, offering discounts on APIs only to complaining customers and only if they threatened to cease using

Stericycle's services, and imposing APIs on customers even after agreeing to reduce the contract price following customer complaints. Stericycle's material misstatements and omissions were likely to and did in fact deceive reasonable customers, including Mount Royal, about Stericycle's services and the prices they would be and were in fact charged.

53.     Mount Royal would have acted differently if it had known that Stericycle imposed the APIs described in this complaint, since such information would have been a material consideration of a buyer in making a decision whether to acquire the waste disposal services of Stericycle. For instance, Mount Royal would have wanted to know, as would any reasonable person, that Stericycle imposes automated price increases that bear no relation to its actual costs. Such information would have changed the decision of Mount Royal and any other prospective customer to use Stericycle's services. Mount Royal would have wanted to know that the charges on the invoices issued by Stericycle would not accurately reflect the amount Mount Royal was contractually obligated to Stericycle, and would not have paid the excess charges had it known the truth.

54.     Stericycle intended that Mount Royal would rely on its misrepresentations as well as the material facts that it concealed, suppressed and omitted, as described above. Among other things, Stericycle intended that Mount Royal rely upon its representations that its regulated medical waste disposal fees would be fixed for the term of the contract other than increases for the limited reasons specifically described in its Steri-Safe Contract. Stericycle also intended for

Mount Royal to rely upon the Stericycle invoices as being true and accurate statements of amounts properly owing, as well as upon the other statements made by Stericycle in attempting to justify price increases. Mount Royal relied upon Stericycle's fraudulent and misleading statements, concealments, suppressions, and omissions, and as a result paid significantly greater amounts than it would have paid absent Stericycle's wrongful conduct.

55.     Through its acts described herein, including without limitation, Stericycle's use of API, its misrepresentations of its sales representatives in the marketing and selling its services, and various provisions of the Steri-Safe Contract, Stericycle violated the Illinois Consumer Fraud and Deceptive Business Practices Act and the IDTPA. Stericycle's acts and omissions constitute unconscionable, false, misleading, and deceptive acts and practices in the conduct of trade and/or commerce.

56.     Stericycle's unfair or deceptive acts or practices occurred in the course of conduct involving trade or commerce, and was directed to the market in general. The complained-of conduct in this case implicates consumer protection concerns.

57.     Stericycle's conduct is a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2. As a violation of Section 2 of the Illinois Uniform Deceptive Trade Practices Act, Stericycle's conduct is a violation of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2.

58.     Stericycle's unfair or deceptive acts or practices proximately caused injury and ascertainable loss to Mount Royal.

59.     As a result of its acts and omissions, Stericycle is liable to Mount Royal for actual damages, treble damages, attorneys' fees, costs, and any other relief the Court deems proper.

## COUNT II

### Fraudulent Inducement

60.     Stericycle had a duty to be truthful to Mount Royal in its representations as to the fee structure by which it would charge Mount Royal for services, including the reasons for which it could justifiably increase prices.

61.     When it presented the Steri-Safe Contract to Mount Royal, Stericycle made false representations of material fact as to when, why, and by how much it would increase Mount Royal's service charges, intending that Mount Royal would rely on these misrepresentations and execute the Steri-Safe Contract.

62.     Mount Royal reasonably relied on these representations in entering into its business relationship with Stericycle.

63.     As a proximate result of Stericycle's false representations, Stericycle damaged Mount Royal and is liable to Plaintiff for compensatory and punitive damages, costs, and any other relief the Court deems proper.

## COUNT III

### Fraud—Automated Price Increases

64.     Stericycle made false representations as to the automated price increases and other material elements of the Steri-Safe contract as described above.

65.     Mount Royal reasonably relied upon those representations when entering into and continuing its business relationship with Stericycle, including paying unjustified and exorbitant fees based on Stericycle's false representations and fraudulent practices.

66.     As a proximate result of Stericycle's false representations and fraudulent practices, Stericycle damaged Mount Royal and is liable to Plaintiff for compensatory and punitive damages, costs, and any other relief the Court deems proper.

## <u>COUNT IV</u>

### **Fraudulent Suppression**

67.     Stericycle had a duty to disclose existing material facts related to its Steri-Safe Contracts with Mount Royal, including that it would impose automatic price increases and that Mount Royal's costs would actually be significantly more than the amounts set forth in the contracts.

68.     Stericycle had knowledge of these material facts.

69.     Through the actions described above, Stericycle suppressed these material facts and presented bogus explanations which were unrelated to and hid the true nature of the unjustified price increases it imposed upon Mount Royal.

70.     Stericycle's suppression of these facts induced Mount Royal to continue its business relationship with Stericycle and pay the unjustified price increases and fees described above.

71.     As a proximate result of Stericycle's suppression of material facts, Stericycle damaged Mount Royal and is liable to Plaintiff for compensatory and punitive damages, costs, and any other relief the Court deems proper.

## COUNT V

### Breach of Contract

72.     Mount Royal entered into valid binding contracts with Stericycle.

73.     Mount Royal performed under the contracts.

74.     Through its acts and omissions described in this Complaint, Stericycle breached its contracts with Mount Royal.

75.     As a result of Stericycle's acts and omissions, Stericycle damaged Mount Royal and is liable to Plaintiff for compensatory damages, costs, and any other relief the Court deems proper.

## COUNT VI

### Unjust Enrichment/Money Had and Received

76.     Mount Royal conferred a benefit on Stericycle by hiring and paying Stericycle for waste-related services.

77.     By its actions as described in this Complaint, Stericycle has been unjustly enriched at Mount Royal's expense and has retained money that should be returned to Mount Royal.

## PRAYER FOR RELIEF

WHEREFORE, Mount Royal seeks judgment in its favor and against Stericycle including, at least:

A.      Declaring that Stericycle's practice of charging Mount Royal automated price increases breached the Steri-Safe Contracts between Mount Royal and Stericycle and was wrongful;

B.      Declaring that the Steri-Safe Contracts between Mount Royal and Stericycle are voidable and unenforceable;

C.      Awarding Mount Royal compensatory damages caused by Defendant's unfair, fraudulent or deceptive practices;

D.      Awarding treble damages to Mount Royal;

E.      Awarding pre-judgment and post-judgment interest to Mount Royal at the maximum rate permitted by applicable law;

F.      Awarding Mount Royal attorneys' fees and costs and expenses incurred in connection with this action; and

G.      Such other and different relief as the Court deems just and proper.

## PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted on July 10, 2018.


*s/ Benjamin B. Coulter*
Edward L. Hardin, Jr. (HAR097)
Anthony C. Harlow (HAR197)
Benjamin B. Coulter (COU027)
Jacob A. Burchfield (BUR206)

*Attorneys for Plaintiff*
MOUNT ROYAL P.A.

**OF COUNSEL:**

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
ehardin@burr.com
tharlow@burr.com
bcoulter@burr.com
jburchfield@burr.com

**PLEASE SERVE BY CERTIFIED MAIL AS FOLLOWS:**

**Stericycle, Inc.**
c/o CT Corporation System
2 North Jackson Street, Ste. 605
Montgomery, AL 36104

_s/ Benjamin B. Coulter_
OF COUNSEL

| State of Alabama<br>Unified Judicial System<br>Form C-34   Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>01-CV-2018-902707.00 |
|---|---|---|

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
### MOUNT ROYAL TOWERS V. STERICYCLE, INC.

**NOTICE TO:** STERICYCLE, INC., C/O CT CORPORATION SYSTEM 2 N. JACKSON ST. STE. 605, MONTGOMERY, AL 36104

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), BENJAMIN BROCK COULTER ,

*(Name(s) of Attorney(s))*

WHOSE ADDRESS(ES) IS/ARE: 420 NORTH 20TH STREET, SUITE 3400, BIRMINGHAM, AL 35203 .

*(Address(es) of Plaintiff(s) or Attorney(s))*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of MOUNT ROYAL TOWERS pursuant to the Alabama Rules of the Civil Procedure.

*(Name(s))*

| 7/10/2018 10:40:23 AM | /s/ ANNE-MARIE ADAMS | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.   /s/ BENJAMIN BROCK COULTER

*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____ .

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*                        *(Name of County)*

Alabama on _____ .

*(Date)*

_____                        _____

*(Address of Server)*

_____        _____

*(Type of Process Server)*        *(Server's Signature)*        _____

_____

*(Server's Printed Name)*        *(Phone Number of Server)*

ELECTRONICALLY FILED
7/12/2018 9:29 AM
01-CV-2018-902707.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

### IN THE CIRCUIT COURT FOR JEFFERSON COUNTY, ALABAMA
### BIRMINGHAM DIVISION

| | |
|---|---|
| **MOUNT ROYAL TOWERS** ] | |
| ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **CIVIL ACTION NO.** |
| ] | **01-CV-2018-902707.00** |
| ] | |
| **STERICYCLE, INC. and  FICTITIOUS** ] | |
| **DEFENDANTS ONE THROUGH** ] | |
| **TWENTY, whose names and identities are** ] | |
| **otherwise unknown to the Plaintiff but** ] | |
| **whose true names will be substituted by** ] | |
| **amendment when they are ascertained, and** ] | |
| **who are further described in paragraph 6** ] | |
| **of the complaint,** ] | |
| ] | |
| ] | |
| ] | |
| **Defendants.** ] | |

### <u>NOTICE OF SERVICE OF DISCOVERY</u>

Plaintiff, Mount Royal Towers, by and through its undersigned counsel, and hereby

notifies the Court that it has served Stericyle, Inc. with the following discovery:

1.      First Discovery to Stericycle.

*s/ Jacob A. Burchfield*
Edward L. Hardin, Jr. (HAR097)
Anthony C. Harlow (HAR197)
Benjamin B. Coulter (COU027)
Jacob A. Burchfield (BUR206)

*Attorneys for Plaintiff*
MOUNT ROYAL TOWERS

32003853 v1

**OF COUNSEL:**

BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
ehardin@burr.com
tharlow@burr.com
bcoulter@burr.com
jburchfield@burr.com


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served on the following by U.S. First Class Mail on this the 12th day of July, 2018:

Stericycle, Inc.
c/o CT Corporation System
2 North Jackson Street, Ste. 605
Montgomery, AL 36104


*/s/ Jacob A. Burchfield*
OF COUNSEL